OPINION OF THE COURT
Joan S. Kohout, J.
A petition requesting custody or alternatively visitation was filed by Joyce A.S. on September 11, 2009 concerning her granddaughter Sierra R, born February 9, 2008. An amended petition was filed on November 5, 2009.
Sierra is placed in foster care with the Monroe County Department of Human Services (DHS). Shane R, Sierra’s father, lodges no objection to the custody petition filed by his mother. Amber M., who appears by her guardian ad litem, Anthony Leavy, opposes the petition as does the Monroe County Department of Human Services. DHS is legal guardian for Ms. M., as well as legal custodian of Sierra. Neither parent has petitioned for custody of Sierra.
A trial occurred over several dates between February 5, 2010 and March 22, 2010. At the conclusion of the trial, the attorney for the child argued that Ms. S.’s petition should be dismissed.
Legal Background
Until October 26, 2007, respondent Amber M. was in foster care placement with DHS under a neglect order regarding her parents. On October 26, 2007, Ms. M. turned 21 years old and “aged out” of foster care.
In preparation for her discharge from foster care, DHS applied to Monroe County Surrogate’s Court for guardianship of Ms. M. pursuant to Surrogate’s Court Procedure Act article 17-A. Surrogate’s Court Procedure Act § 1750 permits the Surrogate’s Court to appoint a guardian for a mentally retarded person.
*1103 Before guardianship may be granted under Surrogate’s Court Procedure Act § 1750, certification by a physician and a psychologist or by two physicians that the person is “incapable to manage him or herself and/or his or her affairs by reason of mental retardation and that such condition is permanent in nature or likely to continue indefinitely” is required (SCPA 1750 [1]).
Monroe County Surrogate’s Court appointed DHS as Ms. M.’s guardian in a decree and letters of guardianship dated December 8, 2006. The decree also specifically permitted DHS to make health care decisions for Ms. M. as permitted by Surrogate’s Court Procedure Act § 1750-b, which relates to health care decisions for “mentally retarded persons.”
Sierra R. was voluntarily placed in foster care shortly after birth on February 9, 2008 pursuant to Social Services Law § 358-a. The voluntary placement agreement was signed by DHS Division of Social Services Commissioner Cynthia W. Lewis on behalf of the mother Amber M. with the notation “DHS has guardianship of Amber and consents for her.” The instrument was also signed by Sierra’s father, Shane R.
By order and decision dated August 13, 2008 this court approved the placement agreement and found that it was in Sierra’s best interest to continue in foster care. In the order and decision, the court found that prior to accepting Sierra in foster care DHS placed Ms. M. on a list for placement in a New York State Developmental Disability Services Office (DDSO)[1] group home for parents and children. On August 13, 2008, the court also ordered DHS to “explore the availability of supervised living programs that might be suitable [as an alternative to foster care] for Ms. M. and her daughter.” No suitable supervised living program has been located and Sierra continues in foster care. No request has been made by either parent to discharge Sierra from foster care to his or her custody.
Periodic permanency hearings have been held as required by Family Court Act article 10-A. The goal during the permanency hearing reviews has been to safely discharge Sierra from foster care to a parent. Unfortunately, that has not been possible. The next permanency hearing review is scheduled for April 6, 2010. The permanency hearing report filed with the court by DHS for that review requests continued foster care and states that *1104 “[n] either Amber or Shane are able to care safely for Sierra on their own.”
Findings of Fact
Amber M. and Shane R. are the parents of Sierra R., who is now two years old. Neither parent has ever had custody of Sierra. Shortly after her birth Sierra’s father and DHS, as Ms. M.’s legal guardian, placed Sierra in foster care.
Sierra’s foster mother, Margaret Me., permits Ms. M. to live in her home as a boarder per an arrangement with DHS. Ms. Me. has a total of five foster children in her care. Also in the home is Ms. M., a former foster child named Jamie L. and Ms. Me.’s daughter, Heather. Ms. Me.’s son and his family live in an attached apartment. A total of 13 people live in the residence.
Ms. Me. testified that Ms. M. is not permitted to be alone with Sierra. Sierra sleeps in a room with Ms. Me.’s adult daughter, Heather. Ms. Me. described daily activities that Ms. M. performs under supervision for Sierra, including getting Sierra up and giving her breakfast. Ms. Me. was instructed, presumably by DHS, that Ms. M. must always be supervised when she is with Sierra.
Monroe County Surrogate’s Court has determined that Ms. M. is a mentally retarded person as defined by Surrogate’s Court Procedure Act § 1750 (1). Since Ms. M. is mentally retarded, she is eligible for the services of a residential habilitation worker through the Office of Mental Retardation and Developmental Disabilities (OMRDD). Lifetime Assistance Family Coordinator Lisa VanLeeuwen testified that she provides in-home services to developmentally disabled parents. Ms. M. has four basic goals: to learn about child development and health, budgeting, planning and scheduling, and nutrition. Ms. VanLeeuwen observes Ms. M. with Sierra and explains things to Ms. M. She takes Ms. M. out shopping and for appointments.
Ms. M. also receives assistance from DHS child protective caseworker Lesley Harold. Ms. Harold regularly meets with Ms. M. and monitors Sierra in the foster home. It is Ms. Harold’s responsibility to ensure Sierra’s safety, monitor the services and work with the parents.
Although there was no testimony regarding the extent of Ms. M.’s mental retardation, the existence of a court appointed guardian allows the court to infer that Ms. M. does not possess the necessary judgment or ability to independently care for herself, manage her own affairs or make health care decisions. *1105 Additionally, her cognitive limitations make her eligible for OMRDD supported services. Ms. M. did not testify or present proof inconsistent with these findings.
Although Ms. M. clearly loves her daughter, she has demonstrated significant deficits in her ability to care for Sierra. These deficits are undoubtedly the reason that the foster mother cannot leave Ms. M. and Sierra alone.
The petitioner, Ms. S. testified to her observations of Sierra and her mother. Ms. S. has observed Ms. M. grab Sierra and “whack” her head. On multiple occasions, Ms. S. has seen Ms. M. roughly yank Sierra’s arm. There is no suggestions that these acts were deliberate, but instead appear to be related to Ms. M.’s lack of judgment. Based on these observations, Ms. S. believes that her granddaughter is not safe with her mother unless there is constant supervision.
Despite being provided with specially designed services over a two-year period, Ms. M. is not capable of caring for her daughter without 24-hour supervision. As a result, in the permanency hearing report for April 6, 2010 DHS does not recommend that Sierra be discharged from foster care to Ms. M.’s custody.
All of these factors support a finding, consistent with the position of DHS in Sierra’s most recent permanency report, that Ms. M. is not able to safely care for Sierra on her own without constant observation, direction and supervision. Significantly, there is no proof presented that Ms. M. has the capacity to develop the needed judgment and skills to independently care for her child as the child gets older.
Sierra’s paternal grandmother, Joyce S., has visited Sierra weekly since birth with the approval of DHS. Early visits were at the home of the foster mother. Visits are currently weekly on Saturday or Sunday for 10 to 12 hours at a time. During the visits, Sierra is well behaved and is well cared for by her grandmother. Also in the home are Ms. S.’s father and her 18-year-old daughter.
If Ms. S. obtains custody of Sierra, Ms. S. would have Sierra sleep in her room until a larger apartment was available. Ms. S. has spoken to her landlord about this plan.
Ms. M.’s attorney and DHS suggest that Ms. S. is not physically able to care for Sierra because Ms. S. injured her back in March 2009. Ms. S. worked as a full-time residential care assistant until March 2009 when she injured her back at work. She is presently waiting for decisions regarding her applications for *1106 disability and workers’ compensation. Ms. S. receives food stamps now that she is not working and would need some financial assistance if she had custody of Sierra. Ms. S. would no doubt be eligible to apply to DHS for financial aid, Medicaid and food stamps for her granddaughter. DHS is currently providing for Sierra’s financial support through foster care funds. Neither parent pays child support for Sierra.
Although Ms. S. experiences pain associated with her back injury, she is able to cook, clean and attend to her granddaughter during visits. She is able to lift Sierra when needed and if assistance was required her daughter or father are available to help out. Neither DHS nor Ms. M. presented proof of any problems during Ms. S.’s visitation with Sierra.
Ms. S. does not want Sierra to grow up in foster care. Ms. S. supports liberal contact between Sierra and her mother and testified that she would allow Ms. M. to see Sierra daily if Ms. M. wished. Supervision would, however, be required.
Ms. S. supervises some of her son Shane’s visits. Shane does not visit every weekend, but is able to see Sierra at his mother’s home during her visitation periods. Mr. R. does not oppose his mother’s petition and wants Sierra to be with his mother if she gets custody.
Discussion
Sierra is presently in the custody of DHS as the result of a voluntary foster care placement pursuant to Social Services Law § 358-a. Neither parent has legal custody and neither parent has requested custody of Sierra as part of this proceeding. Mr. R. does not oppose his mother’s petition. Ms. M.’s only plan for Sierra is the continuation of foster care.
Foster care is designed to be a short-term plan (see Social Services Law § 384-b [1] [b]). As the Court of Appeals noted in Matter of Joyce T (65 NY2d 39, 47 [1985]), which was a case involving mentally retarded parents, “the Legislature . . . clearly did not contemplate foster care as a permanent condition, or even a desired goal for the long, indefinite duration, because prolonged foster care is not in a child’s best interests.”
Furthermore, under the Adoption and Safe Families Act (ASFA) (Pub L 105-89, 111 US Stat 2115) and its regulations, child welfare agencies such as DHS must move expeditiously toward permanency for children in foster care. Absent narrowly drawn exceptions, agencies are required to file a termination of parental rights petition when a child has been in foster care for *1107 15 of the last 22 months (see 45 CFR 1356.21 [i] [1] [i]). Sierra has been in foster care over 24 months and DHS is now legally required to consider filing a petition for termination of parental rights.[2]
Regarding the custody interests of the mother, the petitioner must prove that extraordinary circumstances exist including “surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances” (Matter of Bennett v Jeffreys, 40 NY2d 543, 544 [1976]; see also Domestic Relations Law § 72 [2]). The parent’s voluntary relinquishment of custody along with other factors (Matter of Michael G.B. v Angela L.B., 219 AD2d 289, 293 [4th Dept 1996]) or the mental status of a parent where it impacts on the parent’s ability to keep the child safe (see Matter of Nellie R. v Betty S., 187 AD2d 597 [2d Dept 1992]; Matter of Gambino v Vargas, 209 AD2d 893 [3d Dept 1994]; see also Matter of Brault v Smugorzewski, 68 AD3d 1819 [4th Dept 2009]) may constitute extraordinary circumstances. Once extraordinary circumstances are proven, the court must still determine what custody arrangement is in the child’s best interest before custody may be transferred to a nonparent (see Matter of Bennett v Jeffreys, 40 NY2d 543, 548 [1976]).
In this case, Ms. M., through no fault of her own, lacks the ability and judgment to manage her own life or safely care for her child. DHS is her court-ordered guardian because Surrogate’s Court determined that Ms. M. is a mentally retarded person as defined by Surrogate’s Court Procedure Act § 1750 (1).
DHS, to its credit, arranged for a foster home for Sierra that would accept Ms. M. as a boarder. DHS has also arranged for a rich array of services for Ms. M. aimed at monitoring and enhancing her parenting skills. Ms. M. has the assistance of a DHS caseworker, a residential habilitation worker and 24-hour supervision by the foster mother and her daughter. Even with these services, Ms. M. has not progressed in her parenting ability enough to be left alone with her daughter.
Additionally, Ms. M. did not testify, which permits the court to draw the strongest negative inference that her testimony would not have controverted the petitioner’s proof (see Matter of Amanda RR., 293 AD2d 779, 780 [3d Dept 2002]).
*1108 Ms. M.’s disability alone is not sufficient to constitute extraordinary circumstances (see e.g. Matter of Miller v Michalski, 11 AD3d 1029 [4th Dept 2004]). But when it is combined with the other circumstances present here, including the voluntary placement of the child in foster care for two years, Ms. M.’s repeatedly rough treatment of Sierra and the assessment by DHS that she must have supervision, at all times she is with her daughter, there is ample proof of extraordinary circumstances to warrant an exploration of Sierra’s best interests.
Regarding the custodial rights of DHS, the standard is also the best interests of Sierra (see Matter of Rita T. v Commissioner of Admin, for Children’s Serus. of City of N.Y., 49 AD3d 327 [1st Dept 2008]). As a grandmother, Ms. S. does not have special standing to request that Sierra be released to her from foster care (see e.g. Matter of Gordon B.B., 30 AD3d 1005 [4th Dept 2006]). However, the commitment and love that flows from the special relationship she has with her granddaughter is a relevant factor in determining Sierra’s best interest.
Ms. S. has also shown great sensitivity to Sierra’s relationship with her mother. Although Ms. S. could have immediately requested custody of Sierra, she gave Ms. M. time to see if she would be able to safely parent the child. As time drifted on without significant improvement, this petition was filed. At no time during Ms. S.’s testimony did the court sense that she was trying to take Sierra away from her mother. To the contrary, Ms. S. offered daily visitation if requested.
Since Sierra’s birth, Ms. S. has visited with Sierra every week and currently has Sierra for 10 to 12 hours at a time. The respondents provided no proof that there were problems during these visits and it is uncontroverted that DHS approved the visitation plan for the grandmother.
Ms. S. candidly and credibly described the work-related injury that she experienced in 2009 explaining that it does not interfere with caring for Sierra. Her daughter and father are also in the home if lifting Sierra were to become an issue.
Sierra is a normal child without any indication of developmental delays. She requires no special services. As Sierra gets older her intellectual abilities will quickly surpass those of her mother. Her grandmother will be able to provide Sierra with greater intellectual and social stimulation than her mother would be able to offer.
The only option offered by Ms. M. and DHS is continuation of Sierra in foster care for an indefinite period of time. DHS has *1109 been working with Ms. M. for over two years to locate a supervised setting that would provide her with sufficient support to ensure Sierra’s safety. No such supervised housing has been located and no proof was presented that any will be available in the foreseeable future. DHS has also been working with Ms. M. to improve her parenting of Sierra, but Ms. M. still requires constant supervision.
A primary consideration in determining what custodial arrangement is in the best interest of a child is the ability of the party or parent to provide “for the child’s emotional and intellectual development, the quality of the home environment and the parental guidance provided” (Matter of Louise E.S. v W. Stephen S., 64 NY2d 946, 947 [1985], citing Eschbach v Eschbach, 56 NY2d 167, 172 [1982]). Ms. S. is better able to provide for Sierra’s future development and possesses the judgment needed to guide her as she grows up.
While stability in a child’s placement is also an important factor in custody determinations, it is not determinative (see Matter of Louise E.S. v W. Stephen S., 64 NY2d 946, 947 [1985], citing Friederwitzer v Friederwitzer, 55 NY2d 89, 94 [1982]). Moreover, an award of custody to Ms. S. will not cut Sierra off from her foster family. If Ms. M. remains in that home, it would be expected that Sierra will visit there.
Furthermore, the current foster home is not a permanent placement for Sierra. This is not a preadoptive home. While there is no indication that the foster mother and her daughter do not take good care of Sierra, a foster home with 13 residents is by necessity a busy place. Ms. S. is in a better position to focus on Sierra’s care and development.
Finally, the respondents suggest that Ms. S. should be denied custody because she has limited financial means. There is no proof in this record that Ms. S. has failed to provide for Sierra’s needs while her granddaughter is in her care. If Ms. S. requires additional financial assistance, she may apply for help through DHS. Furthermore, even if Sierra had access to greater financial benefits while in foster care than in her grandmother’s home, that would not be a reason for her to remain in DHS placement.
Considering all of the relevant factors, the court finds that it would be in Sierra’s best interest to be in the custody of her grandmother, Joyce S.
*1110 The court also finds that it would be in Sierra’s best interest to have liberal and frequent supervised visits with her parents, Amber M. and Shane R, as the parties may agree.

. The court takes judicial notice that DDSO is a subdivision of the New York State Office of Mental Retardation and Developmental Disabilities.

. Social Services Law § 384-b (4) (c) and (6) (a) and (b) permit termination of parental rights when, by reason of mental retardation or mental illness, the parent is unable for the foreseeable future to properly care for his or her child and the child would be in danger of neglect if returned to the custody of the parent.